

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
(AT CINCINNATI)

QFS TRANSPORTATION, LLC }
 }
 Plaintiffs' }
 } Case Number: 1:21-cv-00769
Vs. }
 }
ROBYN HUGUELY Et Al. }
 }
 Defendants' }
_____ /

## DEFENDANT ROBYN HUGUELY'S OPPOSITION TO PLAINTIFFS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION AND MOTION TO DISMISS AND/OR IN THE ALTERNATIVE TRANSFER VENUE MEMORANDUM IN SUPPORTING

To the Honorable United States District Judge Michael Barrett

Comes now, Robyn Huguely, Defendant by and through herself files this Motion In Opposition

To Plaintiff's Motion for a Temporary Restraining Order and Preliminary and Permanent Injunction and

Motion to Transfer Venue and/or Motion For Continuance and in support thereof, would show the

following:

A.   Introduction

1.   In this Complaint filed on December 10, 2021, seeking Relief under the Federal Rules of
     Civil Procedure, Plaintiff has alleged that Defendants violated certain restrictive
     covenants, specifically, Non-Compete, Non-Solicitation, Confidentiality Provisions
     and/or Financial obligations with an Agreement signed by QFS and Defendants. These
     allegations are materially false and Defendants deny all of the allegations. Defendant

does not accept the U.S. District Court of Ohio a proper forum for this action or

jurisdiction and venue. The parties are in disagreement that no actual controversy remains concerning the proper venue. Defendants categorically deny any and all accusations raised by Plaintiffs in this action directly and indirectly.

2. Defendants Robyn Huguely nor Queen Logistics, LLC have not to this date, received a Summons or Complaint from the Plaintiff. Defendant Huguely received an email from a Third Party suggesting that a lawsuit had been filed in the state of Ohio.

3. Defendant Robyn Huguely, argues that a 12(b)(3) Motion To Dismiss or in the Alternative, a Motion to Transfer Venue and asserts that Venue is improper under Rule 12(b)(3) and 28 U.S.C. 1404(a).

4. Venue is improper and inconvenient in this District. Defendants residency and business is outside of this state and this district. The Defendant resides in the State of Georgia. Defendants residence is in the County of Coweta and the state of Georgia. Defendant's place of business, Queen Logistics LLC is also in the state of Georgia and listed with the Georgia Secretary of State which precludes a finding of Proper Venue in this District.

5. A more substantial part of the events or omissions giving rise to this claim occurred outside this district than within it.

6. Defending this action is so inconvenient that the transfer of this case would operate in the interest of justice.

7. An ex-driver of the Defendants, Samuel Bailey who is mentioned in the complaint, was was terminated prior to any alleged inappropriate activity and/or breach of any agreement or misconduct which can not be attributed to the Defendants, (See Exhibit "A")

B. Rule 12(b)(c): Venue is improper and inconvenient

8. Under 28 U.S.C. 1404(a). a district court has the discretion to dismiss or transfer a case if the venue is improper where filed. In addition, Defendants further moves this court for a dismissal of this action or in the alternative, to transfer this action to the appropriate jurisdiction on the grounds that venue is improper under Rule 12 (b)(3) Once a Defendant has raised the issue of venue, the burden of sustaining the venue lies with the Plaintiff. De Joseph v. Odfiell Tankers (USA), Inc. 196F.Supp.d476,479(S.D. Tex. 2002)

C. The elements of the Plaintiffs claim does not give rise to an order granting a Temporary Restraining Order, (TRO).

9. The Defendants have not violated any rules within their Agreement with Plaintiff. Plaintiffs' statements of alleged violations are without merit. Plaintiffs complaint is meant to demean

Defendants and cause irreparable harm to Defendants lives and livelihood.

10. None of the acts alleged by Plaintiff occurred within this district, therefore, the venue is improper. The Regional Business Development, called "Agreement" by the Plaintiff referred to by the Plaintiff is flawed.

11. The arguments put forth by the Plaintiff in this case are wholly unsubstantiated and unsupported by any alleged evidence submitted by the Plaintiff.

12. Plaintiffs choice of this forum is undeserving of any deference and generally should not be allowed under these circumstances.

D, Transfer of Venue is Proper

13. Defendant alternatively requests that this court transfers this action pursuant to 28 U.S.C. 1404(a) to the Northern District of Georgia.

14. The determinate issues are the "convenience" of the parties and of the witnesses.

15. A hearthrug in this District would be a grave injustice to the Defendants as it is cost-prohibitive to litigate in the state of Ohio and it would require the party with far less resources to carry the expenses of travel and lodging. Defendant is a small, minority, female owned business and lacks the resources that may be required to defend her innocence in this action.

16. Any potential witnesses called on by the Defendants would surely also reside in the state of Georgia. If the court takes into account the claims made by the Plaintiff, the venue is relevant.

17. The alleged wrongful acts purportedly took place outside the state of Ohio.

18. All of the factors provided in this case to this court favors transfer .

E. No legitimate business practices of the Plaintiff have been violated.

19. There has not been a breach of any agreement as it relates to the Plaintiff.

20. Plaintiffs actions are merely an attempt to harass, demean, threaten and intimidate the Defendants as the Plaintiff seek to retaliate against Defendant s and other potential agents who decide to terminate their agreement with the Plaintiff. It is more than obvious that the Plaintiff seeks to make an "example" out of the Defendants

21. The Plaintiff knew or should have known that the agent in question and at issue in this the complaint was terminated before any alleged infraction occurred. Defendants can not be held liable for the acts of any person's behavior that are no longer under the auspices of the Defendant.

22. There exist no "real"legal basis or purpose for a "TRO" since the alleged person and incident occurred outside of the Defendants control and  no longer affiliated with any of the Defendants and was not during any unlawful infraction against      the Plaintiff.

23. The Plaintiff has not acted in good faith.  Plaintiffs actions are not reasonable.  Plaintiff has taken additional actions to defame Defendants as an act of retaliation.

24. It is not reasonably necessary for the Plaintiffs to be granted any relief in this case. Defendants did not utilize any QFS Identification nor gave access anyone else permission to utilize QFS Identification, logo, name, emails, data, or any other method or code alleged by the Plaintiff.  Any documents purported to show otherwise is wholly false, inaccurate and misleading..

25. Defendant has reasonable knowledge that Plaintiff is using Defendants as "scapegoats".

26. Plaintiff's Complaint was filed as an ill fated attempt to ruin the Defendants business      in a "retaliation" scheme that is swiftly and unambiguously evident.

27. Plaintiffs' attempt to amend it's original complaint purely shows the lack of confidence in the case as initially presented.

28. Plaintiff has consistently taken efforts to "punish" Defendants because they chose to terminate their contract with Plaintiff after 1 year as agreed.

F. Plaintiffs case should be Dismissed

29. Plaintiffs has not  serve or sought to serve any of the Defendants in this case with a Summons or  Complaint.

30. Defendants have fully and substantially performed all of its promises, performances, duties  and obligations as it relates to any terms of the agreement signed by both parties.

31.Plaintiff has not attempted Service of Process of the Summons or the Complaint.

32. Defendant had to rely on a third party;s information regarding the filing of THIS Complaint by the Plaintiff.  Defendant is still waiting for Plaintiff to perfect Service.

33. The initial Complaint was filed more than 27 days ago and has yet to be perfected. Defendant is entitled to perfected service.

34. It is incumbent on the Plaintiff to ensure proper service is made diligently.

35. Plaintiff has completely failed to show that they have acted reasonably and diligently to ensure proper service has been perfected.

36. The Plaintiff has completely failed to show that they have acted reasonably and diligently to ensure service was made on Defendants as quickly as possible.

G. Conclusion

37. Plaintiffs' right to choose the venue in which to prosecute this suit has yet to be established. Plaintiff has not met their burden to show that the current venue is proper. This court should deny Plaintiffs Motion for a Temporary Restraining Order and Temporary and Permanent Injunctive Relief. Defendant prays that this court grants it's Motion to Dismiss or in the alternative, Motion to Transfer this case.

38. Plaintiff has not provided any clear or concise evidence of a Contract Breach or that it was a direct result of the actions directly or indirectly of the Defendants.

of the

39. Defendants will be irreparably harmed if the court grants a Temporary Restraining Order in favor of the Plaintiff since no other issues exist that warrant the granting TRO.

40. Plaintiff is not entitled to specific performance to enforce any rights as it relates to its business agreement with Defendants.

41. Defendant has not been afforded the appropriate time needed nor opportunity to seek and retain competent legal counsel for this immediate action against Queen Logistics, LLC, Therefore, Plaintiffs claim should be barred.

42. The unmitigated fact in this case is that Plaintiff has not attempted for weeks at any point sought to serve Defendants. The law requires service of process which the Plaintiff has yet to initiate and has not offered any legal defense on this issue.

43. Plaintiff should not be rewarded for their willful intent to ignore service of process on Defendants when it is required by law.

44. Plaintiff failed to take appropriate actions to fulfill service related issues.

45. Plaintiff's behavior is clearly a violation of Federal Rules of Civil Procedure.

46. Insufficient Service of Process exists in this case.

47. Courts have held that personal jurisdiction is "the very bedrock of due process"McRae V. White, 269 App.455, 604 S.E.2d 291(2004).

48. Without proper service, no valid lawsuit arises. Plaintiffs case should be dismissed due to the courts lack of jurisdiction.

49. The Summons have not been served on Defendant, Robyn Huguely

50. The Complaint has not been served Defendant, Robyn Huguely

51. The Summons have not been served on Defendant, Queen Logistics, LLC. Nor its Registered Agent.

52. The Complaint has not been served on Queen Logistics, LLC nor it's Registered Agent.

53. Defendants claim Insufficient Service of Process.

54. Defendants object to personal jurisdiction.

55. QFS will not suffer any substantial harm or irreparable harm because no breach has occurred by the Defendants.

56. Preliminary and Permanent Injunctive Relief will harm Defendants.

57. Injunctive relief will not serve the public interest.

58. Plaintiffs have not produced any evidence that Defendants took part in any willful breach of contract within the Regional Business Development Agreement.

59. Any persons identified by Plaintiff as to any alleged misconduct is not affiliated with Defendants or at any time material to this case.

60. Defendant at no time material to this complaint, violated any terms of the agreement signed by both parties. Defendants can not be held accountable or responsible for the misconduct or actions of any persons not under their employ.

WHEREFORE, Defendants respectfully prays that this court deny Plaintiffs Motion for a Temporary Restraining Order and Preliminary and Permanent Injunctive Relief. Defendants further pray that this court Dismiss or Transfer this action to the United States District Court of Georgia. Defendants further pray for such other and further relief to which she may be entitled. Considering the equities, including the circumstances leading to the filing of this action, and the public interest in

public judgments, Plaintiff is not entitled to any remedy sought.

Respectively submitted,

_____, Date: January 6, 2022

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
(AT CINCINNATI)

| | | |
|---|---|---|
| QFS TRANSPORTATION, LLC | } | |
| | } | |
| Plaintiffs' | } | |
| | } | Case Number: 1:21-cv-00769 |
| Vs. | } | |
| | } | |
| Robyn HUGUELY Et Al. | } | |
| | } | |
| Defendants' | } | |

## CERTIFICATE OF SERVICE

Comes now, Defendants who files this Certificate of Service states the following:  A copy of this

Motion has been mailed to the below Plaintiff with adequate first class postage affixed to:

QFS Transportation LLC c/o
James Papakirk, Attorney at Law
Flagel &, Suite 410
Cincinnati, Ohio 45241 Papakirk LLC.
50 East Business Way

Office of the Clerk
Potter Stewart U.S. Courthouse
Room 103
100 E. Fifth. Street
Cincinnati, Ohio  45202

QFS Transportation LLC c/o
Charles E. Rust, Attorney at Law
Flagel &, Suite 410
Cincinnati, Ohio 45241 Papakirk LLC.
50 East Business Way

Respectively submitted,

_____, Date:  January 6, 2022

| Show all rows | Excel | Print |

## Pay Report
### Tractor 027 For Terminal 105

Search: _____

| Tractor # | | Vendor Name | A/P Invoice # | Load # | Container # | Due Date | Description | Unapproved Amount | Approved Amount |
|---|---|---|---|---|---|---|---|---|---|
| 105 | 027 | SAMUEL BAILEY | 1307964 | | | 09-30-21 | Insurance - Aug 21 Bobtail | | -78.95 |
| 105 | 027 | SAMUEL BAILEY | 1385412 | | | 08-30-21 | Insurance - Aug 21 Phys Dam | | -155.41 |
| 105 | 027 | SAMUEL BAILEY | 1432277 | | | 09-30-21 | Escrow Reimbursement | | 1,000.00 |
| 105 | 027 | SAMUEL BAILEY | 1204919 | 1168846 | ZCSU054679 | 10-22-21 | ZCSU054679 Undispatched Detention | | -177.20 |
| 105 | 027 | SAMUEL BAILEY | 1204920 | 1168846 | ZCSU054679 | 10-22-21 | ZCSU054679 Undispatched Overweight | | -297.60 |
| 105 | 027 | SAMUEL BAILEY | 1204921 | 1168840 | ZCSU054679 | 10-22-21 | ZCSU054679 Undispatched Fuel | | -97.00 |
| 105 | 027 | SAMUEL BAILEY | 1204922 | 1168846 | ZCSU054679 | 10-22-21 | ZCSU054679 Undispatched Dray | | -210.00 |

Showing 1 to 7 of 7 entries          Previous  1  Next

**Hire Date** 02-16-21

**Vehicle**

| Make | Sterling |
|---|---|
| Type | Sterling |
| Year | 2010 |
| Weight | 17,000 |
| VIN | 2FWJA3CK0AAAN4309 |
| Tax ID | 37C-TB-4474 |

**License Plate**

| Number | EHX301 |
|---|---|
| Issue Date | 02-14-21 |
| Exp Date | 02-15-22 |
| State | GA |

**Roadsides**

**Annual Inspection/Terminations**

| Annual Inspection Issue Date | 02-05-21 |
|---|---|
| Annual Inspection Issue Date | 08-05-21 |
| Terminal Termination Date | 08-02-21 |
| Overall Termination Date | 08-02-21 |

**Dates** 03-26-71, 03-26-71, 03-26-71, 03-26-71

| Maintenance | Out Of Service | Unsafe |

None
Warning
Probation

Exhibit A



ATTORNEYS AT LAW

**James Papakirk**
**(513) 984-8111**
**jpapakirk@fp-legal.com**

November 19, 2021

**VIA EMAIL & US REGULAR MAIL**

Robyn Huguely
201 Horizon Hill
Newnan, Georgia 30265

Queen Logistics, LLC
Attn: Robyn Huguely
201 Horizon Hill
Newnan, Georgia 30265
*queenlogistics80@gmail.com*

### RE: QFS TRANSPORTATION, LLC

Dear Ms. Huguely,

This firm represents QFS Transportation, LLC ("QFS"). I am writing to address the ongoing obligations of you and Queen Logistics, LLC ("Queen") to QFS that survive the termination of the agency relationship. Specifically, as you are aware, Queen entered into an Agreement for Regional Business Development with QFS, dated July 22, , 2020 (the "Agreement"). Robyn Huguely personally guaranteed each of Queen's obligations under the Agreement, including obligations with respect to certain restrictive covenants contained in the Agreement. Those include non-compete, non-solicitation, and confidentiality provisions. Those also include financial obligations. A copy of the Agreement is attached.

It has recently come to QFS's attention that, since the termination of the agency relationship on September 13, 2021, you have been soliciting several agents of QFS on behalf of Mercury Transportation, Inc., an affiliate or operating under the trade name of World Logistics USA ("Mercury/World"), all in violation of the Agreement. Mercury/World is a competitor of QFS in the transportation and logistics business.

QFS is currently investigating your impermissible solicitation activity, as well as any other conduct that constitutes a violation under the Agreement. QFS is also in the process of calculating the amounts owed to QFS, which will be addressed in a separate letter. In the meantime, QFS demands that Queen and Robyn Huguely each immediately cease and desist from undertaking any conduct that violates the Agreement including, but not limited to, directly or indirectly competing with QFS, soliciting its agents, and/or disclosing any confidential information (as defined in the Agreement) in violation of the Agreement. Similarly, Queen and Robyn Huguely should immediately cease and desist using or communicating from any domain names or addresses connected to QFS or that suggest to others any affiliation with QFS. If you are no longer acting as an agent for Mercury/World, please advise us immediately in writing. As QFS continues to

*Robyn Huguely*
*November 19, 2021*
*Page 2 of 2*

investigate this matter, QFS expressly reserves all of its rights and claims under the Agreement and applicable law, including without limitation, its right to seek immediate enforcement of the Agreement, monies due QFS, damages, and all other relief to which it is entitled.  This letter also serves as notice that Queen and Robyn Huguely should preserve and not destroy any data, texts, emails, logs, social media posts, or other documents or communications, whether in tangible or digital format, issued or posted while you have worked as an agent for Mercury/World.

If you wish to discuss this matter further, please contact me or, if you are represented by legal counsel, have your counsel contact me.

Sincerely,

James Papakirk, Esq.

/enclosure

cc:   Emily Barcenas, Esq.

FLAGEL & PAPAKIRK LLC

## AGREEMENT FOR REGIONAL BUSINESS DEVELOPMENT

This Agreement for Regional Business Development ("Agreement"), is made this 22 day of _July_, 20 20 ("Effective Date"), by and between _____ ("Carrier"), an Ohio limited liability company located at 11461 Northlake Drive, Cincinnati, Ohio 45249, _Queen Logistics LLC_ ("Contractor"), located at _201 Horizon Hill Newnan, GA 30265_ and _Robyn Hugely_ ("Guarantor(s)"), whose address is _201 Horizon Hill Newnan, GA 30265_. Carrier, Contractor, and Guarantor(s) may sometimes be referred to collectively herein as the "Parties" and any one of them individually as a "Party."

## RECITALS

WHEREAS, Carrier is a common carrier duly certified and permitted by federal authorities and various state agencies, and whose primary business is transporting commodities in interstate commerce;

WHEREAS, Contractor is an independent contractor that operates and develops business through other transportation companies, and Contractor desires to exclusively provide those services to Carrier in the geographical area of _Southeast region_;

WHEREAS, Contractor understands that this Agreement is not exclusive and that Carrier reserves the right to contract with other independent contractors for trucking/ intermodal/transportation services in this and other geographical areas;

WHEREAS, Guarantor(s) is/are Contractor's majority owner(s) and/or principal(s); and

WHEREAS, the Parties mutually agree to the terms and conditions as outlined herein and enter into this Agreement of their own free will.

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises contained herein, the Parties agree:

1. **RECITALS INCORPORATED**

The Recitals above are expressly incorporated by reference as if fully restated herein and made part of this Agreement.

2. **INDEPENDENT CONTRACTOR STATUS, INDEMNIFICATION, AND GUARANTEE**

A. The Parties intend, understand, and agree that this Agreement creates only a common carrier-independent contractor relationship. The Agreement does not constitute an employment, partnership, or joint-venture agreement between the Parties. Contractor is solely responsible for the means and methods it uses in performing its obligations to Carrier under this Agreement.

Carrier Initial _____
Contractor Initial _RH_
Guarantor(s) Initial _RH_

B.    Contractor may utilize subcontractors to perform services under this Agreement; however, Contractor remains fully responsible for ensuring that any subcontracted services fully comply with this Agreement, and Contractor remains solely responsible for the performance of all services under this Agreement.

C.    Carrier is not responsible for providing any benefits, including, but not limited to, those it provides to its own employees, such as workers' compensation insurance and unemployment insurance, to Contractor or to Contractor's employees, agents, servants, and/or subcontractors. Rather, Contractor is solely and fully responsible for providing any such benefits and will fully defend, indemnify, and hold harmless Carrier from any claims arising from Contractor's failure to do so. Contractor is solely responsible for all withholding and employment taxes due to the federal, state, or local authorities relating to Carrier's payment for work performed by Contractor and/or its employees, agents, servants, and subcontractors under this Agreement. Contractor agrees to fully defend, indemnify, and hold harmless Carrier from (a) any claims made by Contractor's employees, agents, servants, or subcontractors for payment for services performed under this Agreement, and (b) any claims made by federal, state, and/or local authorities on account of withholding or employment taxes related to such payments.

D.    To the fullest extent provided by law, Contractor will fully defend, protect the name and business reputation of, indemnify, and hold harmless Carrier from any claims or damages arising out of or resulting in any part from Contractor's negligent, reckless, knowing, or intentional acts or omissions or contractual breaches, or those of Contractor's agents, employees, servants, and/or subcontractors that perform Contractor's obligations under this Agreement. Contractor's duty to indemnify Carrier shall survive termination of this Agreement to the extent that any claims or damages made or awarded after the termination of this Agreement arise out of or result in any part from Contractor's or Contractor's agents', employees', servants', and/or subcontractors' acts, omissions, or contractual breaches, that were undertaken or omitted during this Agreement's Term (the "Term" and as defined in Paragraph 14 below).

E.    Guarantor(s) hereby personally, jointly and severally, guarantee Contractor's prompt, full, timely, and complete performance of its covenants and performance obligations to Carrier, including, but not limited to, the following: timely payment to all of Contractor's agents, employees, servants, and subcontractors who perform Contractor's obligations under this Agreement; Contractor's confidentiality, non-competition, and non-solicitation obligations to Carrier under this Agreement (as defined in Paragraphs 8 – 10 below); and the prompt payment of any and all of Contractor's present and future indebtedness to Carrier.

3.    CONTRACTOR COSTS

Contractor shall furnish and maintain, at Contractor's sole cost and expense, all facilities and equipment required for Contractor's operations, including, but not limited to, trailer and terminal rental and expenses; repairs; licenses; taxes; insurance; office supplies; workers' compensation insurance; per diem trailer, container, or chassis charges; equipment maintenance

2

Carrier Initial_____
Contractor Initial_ RH
Guarantor(s) Initial_ RH

costs; and computer hardware. Contractor is fully responsible for all costs and expenses related to any sales activities it performs for Carrier. Contractor is not obligated to use any facilities owned or leased by Carrier. Contractor is 100% liable for all per diem and trailer rental costs associated with any and all shipments it handles for Carrier. Carrier shall accrue all per diem and trailer costs on a weekly basis and immediately deduct these costs from any amounts owed to Contractor, regardless of when Carrier is invoiced by Carrier's customers or vendors.

4.  CONTRACTOR SERVICES

Contractor shall perform the following terminal services for Carrier (the "Services"):

A.  Actively develop and solicit freight transportation for Carrier. Contractor will develop business by identifying and soliciting shippers to provide freight to Carrier. Although Carrier may assist Contractor in such obligations by providing Contractor with information or other resources, Contractor remains solely responsible for developing business by identifying and soliciting potential shippers. Contractor will negotiate rates with shippers subject to Carrier's final approval. Contractor must confirm all shipping rates in writing and signed by the shipper before presenting them to Carrier for final approval; oral quotes are not acceptable. Carrier may deny the approval for any shipper or shipping rate in its sole and absolute discretion.

B.  Arrange for Carrier's freight to be hauled by independent contractor/owner-operators or brokered to motor carriers. Contractor represents and warrants that it will only recruit independent contractor/ owner-operators and motor carriers ("Independent Entities") who meet federal, state, and local qualifications, as well as Carrier's driver qualifications (including pre-employment and random drug and alcohol testing) and Carrier's insurers' requirements, to haul freight for Carrier, and to refer all such Independent Entities to Carrier for final approval. Contractor shall become familiar with and fully enforce Carrier's safety standards, including requirements for equipment maintenance and testing. Contractor certifies that it has read and will abide by the U.S. Department of Transportation safety requirements and that it shall consistently monitory and not require or permit any of its drivers to exceed the hours of service regulation. Contractor understands that federal law requires that any Independent Entities utilized by Contractor to haul Carrier's freight must sign agreements directly with Carrier. Carrier retains the ultimate authority to decide which Independent Entities it will contract with. In performing its obligations under this Agreement, and pursuant to federal law, Contractor represents and warrants that it will only use Independent Entities that have directly contracted with Carrier. Contractor also agrees to immediately transmit to Carrier any DVER (roadside inspection), evidence of overweight fine, or traffic violation that Contractor becomes aware of or that comes into Contractor's possession during the Term (as defined below).

C.  Contractor is the designated liaison between Carrier and the Independent Entities. Contractor will offer Carrier's freight to the Independent Entities and relay information concerning results desired by customers to the Independent Entities. Contractor understands and agrees that such Independent Entities are not Carrier's employees. As Carrier must legally

3

Carrier Initial_____
Contractor Initial **RH**
Guarantor(s) Initial **RH**

contract with Independent Entities utilized by Contractor to haul Carrier's freight, Contractor will calculate all payments Carrier owes to such Independent Entities and timely provide this information to Carrier. Contractor is fully responsible for the accuracy of these calculations and will promptly reimburse Carrier for any overpayments to these entities.

        D.     Contractor will provide and perform order entry and computer dispatch functions. Contractor will also provide computer hardware and accounting services to fully perform its obligations under this Agreement. Contractor is solely responsible for determining the manner and means by which Contractor performs these functions. Contractor will retain all billing and other business records for at least three (3) years following the shipment date(s) and return all such records to Carrier upon this Agreement's termination.

        E.     All vehicles utilized in any way by Contractor will be placarded with Carrier's logo. Contractor's trucks will remain placarded with Carrier's logo until this Agreement terminates, at which time Contractor affirms it will immediately remove placards upon notification by Carrier and provide reasonable written evidence and/or confirmation that this has occurred in a timely manner.

## 5.    CONTRACTOR'S INSURANCE

Contractor shall insure and fully defend, indemnify, and hold harmless Carrier for any loss or damage to any freight shipments while they are not under Carrier's dispatch, but are in Contractor's possession or care or the care of Contractor's agents, employees, servants, or subcontractors, including but not limited to, loss or damage caused by negligence, theft, spoilage, breakage, or improper handling. Contractor shall pay all deductibles for any insurance required under this Agreement. Prior to performing its obligations under this Agreement and annually thereafter during this Agreement's duration, Contractor shall furnish Carrier insurance certificates verifying that (1) all insurance required by Carrier is in effect, and (2) all such insurance names Carrier as an additional insured. All insurance must contain a provision requiring the insurance company to provide Carrier a minimum of thirty (30) days' advance written notice before the cancellation or reduction of any such insurance. Contractor shall immediately notify Carrier in writing and transfer all information about any shortage, overage, and damage claims. Contractor shall perform any inspections necessary to resolve shortage, overage, or damage claims and cooperate with Carrier's Claim Departments and/or insurers regarding such claims. Carrier is liable under federal law for every shortage, overage, or damage claim; thus, Carrier is authorized to adjust, settle, or compromise such claims even if they arise from Contractor's conduct, omission, or inaction. In the event Carrier incurs equipment or cargo loss while the same is not in the care or custody of a contract owner-operator, Contractor is liable for the first $5,000.00 in losses. The same $5,000.00 liability applies if a contract owner-operator or driver of Contractor abandons any piece of equipment and/or a loss of cargo or equipment occurs.

4

6. COLLECTIONS

In accordance with applicable law, Contractor shall timely prepare, maintain, and promptly forward copies of all records and reports to Carrier. Contractor shall also prepare, maintain, and provide Carrier with any records and reports needed by Carrier to evaluate Contractor's compliance with its obligations under this Agreement. Contractor shall remit to Carrier daily all monies that it collects on Carrier's behalf.

7. EXCLUSIVITY

This is an exclusive agreement for services. Contractor must devote exclusive services to Carrier and shall not perform any services for any other carrier or competitor of Carrier at any time during the Term (as defined in Paragraph 14 below).

8. NON-COMPETITION

Contractor and Guarantor(s) acknowledge that Carrier will provide them with access to Carrier's Confidential Information (as defined in Paragraph 10 below) during the Term to allow Contractor to effectively provide services to Carrier. Contractor and Guarantor(s) also recognize Carrier's need to prevent unfair competition and to protect Carrier's legitimate business interests, and that the Confidentiality obligations set forth in Paragraph 10 of this Agreement are insufficient to fully protect those interests. Accordingly, Contractor and Guarantor(s) agree that, during the Term and for a period of one (1) year following this Agreement's termination (for any reason), neither Contractor nor Guarantor(s) shall in any manner, directly or indirectly, whether as an employee, proprietor, partner, consultant, salesperson, independent contractor, joint venturer, principal, owner, agent, broker, representative, officer, or director, provide any Contractor Services (as defined in Paragraph 4 above) that Contractor provides Carrier to any person or entity (whether a sole proprietorship, partnership, corporation, firm, joint venture, trust, or other organization or entity) that is engaged in intermodal shipping, third-party logistics, freight brokerage, truck brokerage, supply-chain management, or any related services, and thereby competes with Carrier ("Competing Business"), within any state or geographic area where Carrier has conducted operations during the Term or plans to conduct operations if Contractor and/or Guarantor(s) learned about those expansion plans during the Term. Contractor and Guarantor also both agree that during the Term and for a period of one (1) year following this Agreement's termination (for any reason), they will not have, maintain or obtain an active trucking or brokerage authority. To lessen the chance that Contractor and/or Guarantor(s) violate this paragraph's restrictive covenants and consequently expose themselves to a legal action by Carrier to enforce this Agreement, for the one year following this Agreement's termination (for any reason), Contractor and/or Guarantor(s) also agree to immediately (and prior to entering into an agreement) notify Carrier (pursuant to the requirements of Paragraph 27 below) of their intention to contract with or otherwise provide services to an actual or potential Competing Business and provide Carrier with the name of such Competing Business.

5

Carrier Initial _____
Contractor Initial _RH_
Guarantor(s) Initial _RH_

9.    NON-SOLICITATION

A.    Contractor and Guarantor(s) recognize Carrier may provide and tender certain loads and business to Contractor from existing customers of Carrier during the Term (those existing customers and Carrier's relationships with those customers shall hereinafter be referred to as "Carrier Business"). Contractor and Guarantor(s) agree that for two (2) years following this Agreement's termination (for any reason), they will not solicit or perform any services for Carrier Business, or otherwise take any action to divert business away from Carrier. Any customers that Contractor can demonstrate that it solicited and moved loads for prior to entering this Agreement would not be excluded from "Carrier Business"; however, Carrier reserves the right to challenge any such requested exclusions. Concurrent with executing this Agreement, Contractor and Guarantor(s) agree to notify Carrier in writing of all such customers that either Contractor or Guarantor(s) claim should be excluded from this non-solicitation section. Otherwise, Carrier will be allowed to reasonably infer and rely upon the fact that no such exclusions exist.

B.    Contractor and Guarantor(s) agree that, during the Term and for a period of three (3) years following its termination (for any reason), neither Contractor nor Guarantor(s) shall in any manner, directly or indirectly, interfere with, tamper with, disrupt, use, or attempt to disrupt any contractual or other relationship, or any prospective relationship, between Carrier and any of its customers, owner-operators, agents, clients, consultants, suppliers, vendors, lessees, or lessors.

C.    Contractor and Guarantor(s) agree that, during the Term and for a period of one (1) year following this Agreement's termination (for any reason), neither Contractor nor Guarantor(s) shall in any manner, directly or indirectly, whether as an employee, proprietor, partner, consultant, salesperson, independent contractor, joint venturer, principal, owner, agent, broker, representative, officer, or director, solicit or hire any of Carrier's employees, office personnel, owner-operators, or other agents who are currently, or were at any time during the Term, leased to or working for Carrier, other than those owner-operators who are leased by and under Contractor's exclusive dispatch and control.

10.    CONFIDENTIALITY

A.    Contractor and Guarantor(s) acknowledge and agree that information concerning Carrier's or its affiliates' computers, computer databases, software, Carrier Business, operating policies and procedures, methods of computer software development and utilization, computer source codes, financial records (including, but not limited to, credit history and information about customers, prospective customers, owner-operators, and suppliers), information about transactions, the terms of business dealings and relationships with customers, financial and operating controls and procedures, documentation, contracts and agreements of all kinds (including those with customers, owner-operators, other agents, suppliers and vendors), pricing lists, marketing information, sales lists and strategies, customer lists, owner-operator lists, agent lists (including contact names, physical and email addresses, telephone numbers, and

6

other identifying information), intellectual property or trade secrets, customer account information, business policies, purchasing information, and all information provided by Carrier to Contractor and/or Guarantor(s) during the Term to allow them to provide the Services is Carrier's sole and separate proprietary and confidential information ("Confidential Information").

B.       Contractor and Guarantor(s) specifically affirm and acknowledge that Carrier's customer lists, agent lists, other information about Carrier's customers and agents, and the contents of and information stored in Carrier's computer system are proprietary trade secrets with significant economic value, compiled through a substantial investment of time and money by Carrier, and are not common knowledge throughout the industry. All such trade secrets and Confidential Information are for use only by Carrier as required to fully perform the Services and may only be shared by Carrier with its personnel that have a need to know the information to provide the Services

C.       Contractor and Guarantor(s) acknowledge that Contractor, as an agent of Carrier, will require access to such Confidential Information during the Term to  effectively perform its duties. Contractor and Guarantor(s) also agree that the use of or access to such Confidential Information does not give Contractor or Guarantor(s) any ownership rights whatsoever in the Confidential Information. Upon termination of this Agreement (for whatever reason), Contractor and Guarantor(s) shall immediately cease using and return such Confidential Information, regardless of form, to Carrier. Contractor and Guarantor(s) shall not, during the Term or at any time thereafter, divulge or disclose to anyone, or use for their own benefit, any of the   Confidential Information. Contractor and Guarantor(s) shall, upon this Agreement's termination, destroy or deliver to Carrier (at Carrier's sole discretion) any and all originals and copies of any Confidential Information in their possession, and they shall not make or retain any copies of such materials.

D.       All computer passwords are assigned to individuals, and Contractor agrees that each of its individual's log-in password and entry credentials into Carrier's computer system will be restricted to those specific users, and that none of Contractor's staff will share or use someone else's password. Prior to providing access, Contractor will notify Carrier in writing of the identify of all its employees or contractors who will receive log-in password or entry credentials into Carrier's computer systems or otherwise receive or have access to the Confidential Information.  Carrier retains the sole discretion to grant, deny or restrict such access to these individuals.

E.       Contractor and Guarantor(s) agree that they will not, either during the Term or at any time following the Agreement's termination (for any reason), directly or indirectly, disclose any of the terms and conditions of this Agreement or any of  the Confidential Information.

7

Carrier Initial _____
Contractor Initial _RH_
Guarantor(s) Initial _RH_

11. **MATERIAL BREACH, REMEDIES, PRESUMPTION REGARDING CONFIDENTIAL INFORMATION, AND ATTORNEYS' FEES**

      A.    Contractor and Guarantor(s) recognize and agree that any breach of the restrictive covenants and confidentiality provisions set forth in Paragraphs 8 – 10 above shall constitute a material breach by Contractor and/or Guarantor(s) of their obligations under this Agreement. Contractor and Guarantor(s) further recognize and agree that the foregoing geographic, duration, and content restrictions are reasonable and properly required for the adequate protection of Carrier and Carrier's business interests. Contractor and Guarantor(s) state that they have carefully considered the nature and extent of the restrictions upon Contractor and Guarantor(s) during and after the Term, as well as the corresponding rights and remedies conferred upon Carrier, and Contractor and Guarantor(s) hereby acknowledge and agree that those restrictions, rights, and remedies are reasonable in duration, geography, and content, are reasonably intended to eliminate unfair competition against Carrier, are necessary, and are reasonably tailored to protect Carrier's legitimate business interests.

      B.    Contractor and Guarantor(s) both agree that this Agreement's restrictive covenants are of a special and unique nature, that Carrier will suffer immediate and irreparable harm as a result of Contractor's and/or Guarantor(s)' breach or threatened breach of those covenants, and that Carrier's damages resulting from any breach will be inordinately difficult to determine and likely inadequate to fully and fairly compensate Carrier. Accordingly, since Carrier is without an adequate legal remedy if Contractor and/or Guarantor(s) breach any of this Agreement's restrictive covenants, Carrier shall be entitled to obtain immediate injunctive relief, whether temporary, preliminary, or permanent, in addition to any other remedy Carrier may have at law or in equity (including recovery of damages). Contractor and Guarantor(s) expressly agree that in any such action for equitable relief brought by Carrier, any requirement for Carrier to show or establish irreparable harm or injury shall be satisfied by the introduction of this Agreement into evidence.

      C.    If Contractor and/or Guarantor(s) violate any of this Agreement's restrictive covenants, the Parties agree that the terms of any restrictive covenant(s) so violated shall automatically be tolled during any period of breach and extended for the length of any such breach. This Agreement's restrictive covenants shall survive termination of the Agreement (for whatever reason).

      D.    Contractor and Guarantor(s) agree that, during the time limits of this Agreement's restrictive covenants, Contractor's engagement in any form of agency or business relationship with a competitor of Carrier, other than on behalf of Carrier, will be presumed to necessarily result in Contractor revealing, basing judgments and decisions upon, or otherwise using the Confidential Information to unfairly compete with Carrier.

      E.    Contractor and Guarantor(s) further agree to pay any and all legal fees, including without limitation, all reasonable attorneys' fees, court costs, and any other related fees and/or costs incurred by Carrier in enforcing this Agreement's restrictive covenants.

8

Carrier Initial _____
Contractor Initial _KH_
Guarantor(s) Initial _KH_

12.    **BREACH AND DAMAGES**

A.    If Contractor and/or Guarantor(s) breach or threaten to breach any of their material obligations under this Agreement, in addition to all other remedies in law and equity available to Carrier, Carrier shall have no obligation to make any further payments to Contractor pursuant to this Agreement until such breach is cured, if possible.

B.    Contractor and Guarantor(s) recognize that if either or both breach any of their material obligations under the Agreement related to the restrictive covenants ("Event of Breach"), Carrier's actual damages sustained from such a breach are difficult to estimate as of the Effective Date and would be difficult and impractical for Carrier to reasonably ascertain and prove. Therefore, in an Event of Breach, Contactor and Guarantor(s), jointly and severally, agree to pay liquidated damages to Carrier in an amount equivalent to Contractor's average monthly revenues on Carrier Business for both the three (3) full months immediately preceding and following the month that the Event of Breach occurred, in addition to the injunctive remedies and specific performance relief outlined in Paragraph 11 above. The Parties agree that this amount of liquidated damages is reasonable, not a penalty, and just and proper compensation to Carrier for any damages likely to result from an Event of Breach.

13.    **TERMINATION**

If any Party materially breaches this Agreement and fails to cure such breach within three (3) business days after receiving written notice by the non-defaulting Party, the non-defaulting Party may terminate this Agreement by sending written notice of termination to the breaching Party. Any failure to so terminate shall not constitute a waiver of such breach or any other breach of this Agreement, and the termination of this Agreement shall not release any of the Parties from any liability that has accrued prior to the Agreement's termination. In the absence of such breach, only Carrier may terminate this Agreement for convenience before the Term has expired. Carrier may do so by giving thirty (30) days' written notice to Contractor.

14.    **TERM**

This Agreement shall be effective from ⟍July 22, 2020⟍o _____ (the "Term"); provided, however, that the Term shall automatically renew for successive one-year terms unless (i) one of the Parties provides written notice of non-renewal at least thirty (30) days prior to the end of the then-existing Term, or (ii) this Agreement is otherwise terminated pursuant to Paragraph 13 above.

15.    **TEMPORARY SUSPENSION**

The Parties' respective obligations shall be temporarily suspended during any period where any of the Parties cannot comply with the requirements of the Agreement by force majeure events such as acts of God, public enemy, labor disputes, fires, floods, strikes, work stoppages, civil riots, and other contingencies beyond the reasonable control of the affected Party. Carrier shall incur no liability to Contractor in the event of any of the above events.

9

Carrier Initial _____
Contractor Initial _CH_
Guarantor(s) Initial _CH_

16.   FREIGHT CHARGE COLLECTION

Carrier has the exclusive right to handle all billing of freight charges to the customer for the Services provided herein and, as such, Contractor agrees that it waives any and all rights to institute any collection efforts against the shipper, receiver, consignor, consignee, or the customer. Carrier, Contractor, and Guarantor(s) expressly affirm that the receivables generated through Contractor's services are Carrier's property. Contractor acknowledges that Carrier may take any reasonable action regarding receivables not collected after ninety (90) days, including but not limited to, taking legal action and placing a credit hold place on the customer. Such actions may also include partial or full chargeback to Carrier under certain circumstances, including but not limited to: invalid receivable(s); balance due(s) of de minimis amounts; and disputed charges where Carrier believes it is in Carrier's and/or Contractor's best interest to write off, credit, or chargeback the receivable(s). Contractor agrees to pay Carrier for any deficit balances or other obligations upon notification and substantiation of indebtedness within ten (10) days. Late charges of eighteen percent (18%) per annum (or the highest rate permitted under applicable law), compounded daily, shall be assessed on all outstanding indebtedness of Contractor to Carrier until fully paid.

17.   CONTRACTOR'S ADDITIONAL RESPONSIBILITIES

Contractor shall furnish, at its sole cost and expense, any and all fuel, reefer fuel, oil, grease, tires, and other items necessary to perform the Services, operate the equipment and transport the freight, including, but not limited to, pickup and delivery, accessorial services, and local equipment charges in accordance with Carrier's tariffs. Contractor shall also keep and maintain said equipment in good repair and mechanical operating condition in compliance with specifications, laws, and regulations of Carrier, the U.S. Department of Transportation, and all other applicable governmental authorities or agencies having jurisdiction thereof. Contractor shall notify Carrier by telephone, to be confirmed in writing, if the shipper requires any accessorial services prior to rendering such services to shipper.

18.   RETURN OF EQUIPMENT UPON TERMINATION

Contractor and Guarantor(s) agree that, immediately upon this Agreement's termination (for whatever reason), Contractor shall deliver any and all of Carrier's and/or third-party's containers, rental trailers, and shipments to Carrier's terminals or to a place designated by Carrier. Contractor shall not in any fashion encumber or delay the return such equipment. Until Contractor so delivers Carrier's equipment, Contractor acknowledges it is not legally entitled to any funds allegedly due to Contractor by Carrier, and Carrier shall have no obligation to pay Contractor any amount due to Contractor until Carrier's equipment is so delivered. If the equipment is not so delivered, Carrier, in addition to any and all other rights it may have, may immediately possess such equipment and arrange to deliver them, at Contractor's expense, to Carrier's terminal. Contractor shall pay upon demand, or Carrier may offset against any amounts coming due to Contractor, all costs incurred from the date that Contractor fails to return the equipment to Carrier until the equipment is returned to Carrier's terminal, plus a rental fee of

10

Carrier Initial_____
Contractor Initial _PH_
Guarantor(s) Initial _PH_

$150.00 per day per container or trailer. Contractor hereby waives any and all liens, defenses, or legal objections to any suit involving Carrier's and/or third-party's equipment.

19. DEPOSIT

Contractor and Guarantor(s), jointly and severally, hereby indemnify and hold harmless Carrier from and against any and all losses, claims, suits, costs, and expenses (including reasonable attorneys' fees and costs incurred by Carrier in defending an indemnified claim or in seeking to enforce or collect the indemnification provided hereunder) incurred by Carrier ("Losses") that are caused by the negligence or reckless, knowing, or intentional misconduct of, or breach of this Agreement by, Contractor, Guarantor(s), or their respective drivers, owner-operators, or agents. Contractor shall deposit with Carrier 1% of the gross revenue of Contractor each week until the Deposit is reached, or post a Bond upon execution of this Agreement in the amount of $10,000.00 (the "Deposit") to be held by Carrier to secure the foregoing indemnification obligation. Without limiting any other available remedy, Carrier may, upon written notice to Contractor, apply the Deposit to reimburse Carrier for the amount of any Losses and or any other amount owed to Carrier hereunder, and deduct, at Carrier's option, such amounts of monies from Contractor's compensation due hereunder when and as due to reimburse Carrier for any Losses or other amounts in excess of the Deposit, and/or to restore the Deposit to the initial amount funded hereunder. Carrier shall, within ninety (90) days after this Agreement's termination, return the Deposit to Contractor, without interest, minus any amounts then owing Carrier, with a written itemization of deductions.

____ If checked, this paragraph's deposit requirements are waived and no deposit is required.

20. C.O.D. SHIPMENTS

If Contractor received business from a customer who is not an approved credit customer of Carrier, or if such revenue exceeds the credit limit set by Carrier, Contractor will provide service only under a C.O.D. basis. **Contractor is responsible for verifying with Carrier (or by accessing Carrier's computer system) that the customer has not exceeded its credit limit, and Contractor must enter the order into Carrier's computer before picking up the load.** Contractor must have all new customers complete Carrier's credit application, and Contractor must return the signed and completed application to Carrier for credit approval. Contractor will keep a copy of the credit application on file for three (3) years. Customers who do not have credit approval of Carrier are NOT covered by the bankruptcy and insolvency provision of Paragraph 23 below, and will be charged to Contractor if the customer does not pay Carrier within fifteen (15) days. Contractor assumes full liability for credit requested by customer beyond the amount approved by Carrier as well as any and all other exceptions to Carrier's standards. On all C.O.D. shipments, Contractor is responsible for collection of the charges before the shipment is delivered. Contractor will be responsible for all expenses on any C.O.D. shipments where such C.O.D. charges are not collected before delivery. All owner-operator pay, motor carrier brokerage costs, and any other expenses for the shipment will be paid by Carrier

11

and deducted from Contractor. If the C.O.D. charges are later collected from the customer (after the costs were deducted from Contractor), Contractor will be reimbursed within ninety (90) days.

21.     COMPLIANCE WITH LAWS AND REGULATIONS

Contractor shall comply with all the laws, rules, and regulations of the U.S. Department of Transportation, any Public Utility Commission of the state where Contractor will perform any of the Services, and any other federal, state, and local authority which may have Jurisdiction. Contractor warrants that it has now has, and shall continue to have, during the Term the requisite governmental authority or licenses to render the services herein specified. **Contractor agrees not to accept any shipments that have not already cleared U.S. Customs inspection** where the shipment would be subject to Carrier being bonded, without written permission from Carrier. Contractor has received a copy of Carrier's scope of operating authority to provide transportation, and Contractor agrees not to accept or transport any shipments not authorized by Carrier's authority, any refrigerated shipments, or any and all hazardous material shipments unless otherwise approved by Carrier in a separate writing. Contractor warrants that it will comply with federal law by warranting that no person, firm, or corporation (or any employee of such person, firm, or corporation) that is in any way interested in the ownership of the shipments to be transported, loaded, or unloaded will be permitted to perform any services under this Agreement. Contractor will comply with federal law by not paying any monies that could be construed to be kick-backs directly or indirectly to any shipper, consignee, and/or person interested in the freight so handled or transported by Carrier, or to any of their agents, servants, or employees.

22.     COMPENSATION AND BILLING PROCESS

Carrier shall compensate Contractor for all the services performed hereunder as set forth in **Schedule A**, which is attached hereto and fully incorporated herein. Contractor agrees that it will have the customer send all purchase orders and requests for service (hereinafter "Work Orders") in writing in advance of service being performed. Contractor agrees not to provide service to any customer without a written Work Order from the customer, which contains customer's requirements for invoicing the customer and/or a rate confirmation. Contractor agrees to enter all Work Orders into Carrier's computer within one (1) hour of receipt if the Work Order was received between 8:00 AM and 5:00 PM, or the next morning before 10:00 AM on Work Orders received after 5:00 PM the previous day. (All times are Eastern Time.) Contractor will enter into Carrier's computer all dispatches assigned to or delivered by owner-operators or motor carriers during the same business days between 8:00 AM and 5:00 PM and the next morning before 10:00 AM on all assignments and deliveries made after 5:00 PM on the previous day. Contractor and owner-operators will be paid for all work delivered between 12:01 AM Saturday through 11:59 PM Friday (hereinafter "Work Week"), on the first Friday, seven (7) days following the end of each Work Week, provided that (1) the order and dispatch are entered by Friday of the Work Week and (2) the Paperwork (as defined in Paragraph 23(B) below) is received from the owner-operator or motor carrier and scanned into Carrier's computer system by the first Tuesday at 8:00 PM following the end of the Work Week. Contractor shall scan in

12

Carrier Initial _____
Contractor Initial _BH_
Guarantor(s) Initial _CH_

document images each day, on all Paperwork received during each day. Any deductions that Contractor wishes to be taken from the owner-operator, for such things as loans, repairs, inspection fees, etc., will be entered on a load of the owner-operator to be deducted or an e-mail to be sent to Carrier by Contractor seven (7) days prior to the Friday payday in which it is to be deducted.

23.     BILLING ERRORS, AGENT DEDUCTIONS, AND PAPERWORK

A.     If and to the extent any customer fails to pay the full amount of charges ("short pays") for shipments performed by Contractor within ninety (90) days of the invoice date because Contractor failed to provide the correct billing information, set up the correct bill to the customer, or provide the correct billing location, or because the customer was dissatisfied with the service provided, the service did not meet the customer's requirements, the rate was incorrect, or any other reason other than that the customer (1) is insolvent or files for bankruptcy and (2) had approved credit with Carrier, then any amount short paid will be deducted from a subsequent payment due and owing Contractor and/or taken out of the Deposit. If the customer later pays the charge, then Contractor or the Deposit, as applicable, will be reimbursed or credited the amount of the gross compensation that was deducted. Any and all short-paid invoices will be deducted immediately from amount to be paid Contractor for the Services. If Carrier later receives additional payment on such invoices, it will timely pay Contractor such amounts.

B.     Contractor shall issue the "Paperwork," which includes, but is not limited to, (1) a fax Work Order from the customer, (2) proof of delivery, (3) a bill of lading, and (4) the in and out Trailer Inspection Reports on the equipment, on each shipment generated by Contractor, and Contractor shall also secure signatures thereon. An image of that Paperwork will be scanned and indexed by Contractor to Carrier each day in which it is received.

24.     BINDING AGREEMENT AND ASSIGNMENT

This Agreement binds the Parties and their respective owners, share-holders, officers, employees, agents, heirs, successors, and authorized assigns. Contractor and Guarantor(s) agree and consent that this Agreement and the rights, duties, and obligations contained in it may be and are fully transferable and/or assignable by Carrier, and shall be binding upon and inure to the benefit of Carrier's successors, transferees, or assigns.

25.     INTEGRATED AGREEMENT

This Agreement contains the Parties' entire understanding and agreement regarding the Agreement's subject matter and fully supersedes or replaces any prior understanding or agreement between the Parties respecting the subject matter of this Agreement. There are no representations, agreements, arrangements, or understandings, oral or written, between the Parties relating to this Agreement's subject matter that are not fully expressed herein.

13

Carrier Initial _____
Contractor Initial _____
Guarantor(s) Initial _____



26. **WAIVER AND MODIFICATION**

    A.    The Parties agree that any Party's failure to require performance of any of this Agreement's provisions shall not operate as a waiver of the right of the other Parties to subsequently request strict performance of the same or like provisions, or any other provisions hereof.

    B.    No changes, alterations, modifications, additions, or qualifications shall be made to this Agreement unless agreed to in writing by a duly authorized representative of Carrier, Contractor, and Guarantor(s).

27. **NOTICES**

    All notices under this Agreement shall be in writing and given by registered or certified mail, commercial courier service (*e.g.*, FedEx), or facsimile, addressed to such Parties at the addresses set forth below, or to such other address as any of the Parties may advise the others in writing. Notices will be deemed given when delivered.

In case of a notice to Carrier:

QFS Transportation, LLC
11461 Northlake Drive
Cincinnati, Ohio 45249
Attn:   Todd Hammerstrom
Phone: 812-307-4662
Fax:    812-637-2508

In case of a notice to Contractor:

*Queen Logistics LLC*
*201 Horizon Hill*
*Newnan Coa 30265*
*Attn: Robyn Hugely*
*678142 91658*

In case of a notice to Guarantor(s):

*Robyn Hugely*
*201 Horizon Hill*
*Newnan, Ga 30265*

14

28.    GOVERNING LAW, VENUE, AND SEVERABILITY

A.    Contractor and Guarantor(s) understand and acknowledge that Carrier is organized under Nevada law and has its headquarters, and conducts substantial business and operations, in Ohio where it is registered to do business. Contractor further acknowledges and agrees that its performance under this Agreement is due and owing to Carrier, and that a substantial portion of the duties and obligations of the Parties are to be performed in, Hamilton County, Ohio. Accordingly, this Agreement shall be governed by Ohio law, without reference to Ohio's principles of conflicts of laws. The Parties voluntarily consent and agree to the exclusive jurisdiction of the state or federal courts located in Hamilton County, Ohio, over any action, suit, or proceeding arising out of or relating to this Agreement. The Parties further waive any objection to the venue of any such action, suit, or proceeding brought in any such court, and waive any claim that any such action, suit, or proceeding has been brought in an inconvenient forum.

B.    If any provision of this Agreement is held under applicable law to be unenforceable, such provision shall be considered to be separate, distinct, and severable from the other remaining provisions of this Agreement, and shall not affect the validity or enforceability of such other remaining provisions. If any provision is held to be unenforceable as written but may be made to be enforceable by limitation thereof, then such provision shall be unenforceable to the maximum extent permitted by law.

29.    MISCELLANEOUS

A.    This Agreement may be executed in counterparts (which may be delivered by facsimile or other electronic transmission), each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

B.    Contractor and Guarantor(s) represent that they are not bound by any agreement, contract, or other duty to any third party that would prevent Contractor and Guarantor(s) from complying with their obligations hereunder or performing their duties as an agent or contractor of Carrier.

C.    Contractor and Guarantor(s) acknowledge and agree that they had sufficient time within which to consider this Agreement before executing it, have carefully read and fully understand all of the provisions of this Agreement, understand and voluntarily agree to all of this Agreement's terms, knowingly and voluntarily intend to be legally bound by this Agreement, have had sufficient opportunity to consult with their own legal counsel regarding this Agreement's terms and provisions, and have knowingly and voluntarily executed this Agreement through their respective duly authorized representatives.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

15

Carrier Initial____
Contractor Initial 
Guarantor(s) Initial

**CARRIER**

_____

By: _____

Title: _____

**CONTRACTOR**

Queen Logistics LLC

By: _Robin Huguely_

Title: _Owner_

FED ID: _82-4210673_

**GUARANTOR(S)**

_Robin J Huguely_

_Robyn J. Huguely_

16

Carrier Initial _____
Contractor Initial _RH_
Guarantor(s) Initial _RLH_

# No Hazmat Addendum

Contractor, **at no time** will accept, transport, or broker any shipment containing **Hazardous Materials** as defined in 49 US Code Chapter 51. Any breach of this addendum will result in a penalty of $10,000.00 and the Contractor would be responsible for any losses, fines, penalties, lawsuits from this breach.

_____
Contractor Signature

_____7/22/2020_____
Date

19

Carrier Initial____
Contractor Initial____
Guarantor(s) Initial____

***NOTARY ACKNOWLEDGEMENT – CONTRACTOR***

STATE OF _Georgia_ )
) ss:
COUNTY OF _Coweta_ )

The foregoing instrument was acknowledged before me, a Notary Public, on this _30_ day of _July_, 202_0_, by _Robyn J Huguely_, as _owner_ of _Queen Logistics_ on behalf of Contractor.
_LLC_

_Megan Bond_ _____
**Notary Public**
My Commission expires: _4-18-21_

***NOTARY ACKNOWLEDGEMENT – GUARANTOR***

STATE OF _Georgia_ )
) ss:
COUNTY OF _Coweta_ )

The foregoing instrument was acknowledged before me, a Notary Public, on this _30_ day of _July_, 20_20_, by _Robyn J Huguely_, individually.

_Megan Bond_ _____
**Notary Public**
My Commission expires: _4-18-21_

***NOTARY ACKNOWLEDGEMENT – GUARANTOR***

STATE OF _____ )
) ss:
COUNTY OF _____ )

The foregoing instrument was acknowledged before me, a Notary Public, on this _____ day of _____, 20__, by _____, individually.

_____
**Notary Public**
My Commission expires: _____

17

Carrier Initial_____
Contractor Initial_____
Guarantor(s) Initial_____

# SCHEDULE A

## Contractor Pay for Trucking

86% of Line Haul Revenue less truck and all other costs
100% of FSC
86% of A-Bill Trucking Revenue Less all A-Bill costs
100% of A-Bill Pass Through less A-Bill Costs

## Contractor Pay for Brokerage

60/40 split of Profit after truck pay and all costs

0130771.0626281   4835-8816-8058v9

18

Carrier Initial_____
Contractor Initial_ _RH_ _
Guarantor(s) Initial_ _RH_ _

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the
requester. Do not
send to the IRS.**

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

*Queen Logistics*

2 Business name/disregarded entity name, if different from above

*Queen Logistics*

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☒ S Corporation   ☐ Partnership   ☐ Trust/estate

☒ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

*201 Horizon Hill*

6 City, state, and ZIP code

*Newnan, GA 30265*

7 List account number(s) here (optional)

Requester's name and address (optional)

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

or

Employer identification number

| 8 | 2 | – | 4 | 2 | 1 | 0 | 6 | 7 | 3 |

## Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign
Here**   Signature of
U.S. person ▶ *Kaleen Hignelly*   Date ▶ *7/30/2020*

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)



Extremely Urgent

Visit ups.com® or call 1-800-PICK-UPS® (1-800-742-5877) to schedule a pickup or find a drop off location near you.

**Domestic Shipments**

- To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**

- The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.

- To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

Note: Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

# Reusable Express Envelope
## Legal Size

Reduce paper waste by using this envelope a second time – either to return to sender or with another recipient. See reuse instructions on flap above.

## Decision Green℠

Decision Green is UPS's environmental platform, reflecting our pursuit of sustainable business practices worldwide. For example, this envelope is made from 100% recycled material and is both reusable and recyclable.

100% Recycled fiber
80% Post-Consumer



This envelope is for use with the following services:

UPS Next Day Air®
UPS Worldwide Express®
UPS 2nd Day Air®

Do not use this envelope for:

UPS Ground
UPS Standard
UPS 3 Day Select®
UPS Worldwide Expedited®

Apply shipping documents on this side.



PULL TAB TO OPEN